IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                   No. CR 04-1467 JB

GRAND CHINA, INC.,
JING QIAN JIANG, a/k/a RICKY,
MING YUE CHEN AND LINDA ALI,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant Linda Ali's Motion to Reopen Detention Hearing and Set Conditions of Release, Pursuant to 18 U.S.C. § 3142(f), filed October 1, 2004 (Doc. 55). The Court conducted a hearing on this motion on November 22, 2004. The primary issue is whether the Court should reconsider the decision of the United States Magistrate Judge and of this Court to detain Linda Ali until these criminal proceedings are complete. Because the Court does not see the third-party custodian's willingness to put up a property bond as alleviating all the Court's concerns that Ali will appear as these criminal proceedings require, the Court will grant the motion to the extent that it will reopen the detention hearing, but will otherwise deny the motion and will again affirm the detention order.[1]

## FACTUAL BACKGROUND

Ali has a pending asylum application. The United States Department of Homeland Security

---

[1] This Memorandum Order and Opinion is in addition to, and consistent with, the Court's oral ruling at the November 15, 2004 hearing.

has issued Ali an Employment Authorization Card.  See Employment Authorization Card, No SRC0416951072, valid Jun. 4, 2004 - Jun. 23, 2005.  Accordingly, if the Court orders her release, she will have the legal right to work.

Ali used at least six Albuquerque addresses in the year and a half leading up to her arrest.  She owns no real estate and has no substantial holdings within this country.  Wire transfer records reflect that she sent money to her bank account in Indonesia in 2003.  Ali refused to discuss her finances with the Pretrial Services Office.

As to Ali's employment, her answer changes depending on whom makes the inquiry.  She refused to answer the Pretrial Services Office's questions regarding employment.  In January 2003, she stated in her asylum application, under penalty of perjury, that she had been unemployed since entering the United States in June 2001.  To the United States Department of Labor, who was conducting a review of China Wok in March, 2003, Ali stated that she had been working at China Wok for only 2 and a half months.  To the agents conducting search warrants on April 6, 2004, however, she stated that she had been working at China Wok since July, 2001.  To the Court, Ali stated in her Declaration filed on August 3, 2004 that she had only been working since 2003.

Before the criminal investigation, Ali did not report her income to the Internal Revenue Service.  She has used a social security number not assigned to her.

Turk Levy is a retired scientist who held the nation's highest security clearance for decades.  Levy is not a relative of Ali.  Rather, he was a customer at the restaurant where the Ali  worked.  Levy considers himself to be Ali's surrogate grandfather.

Ali refused to identify to the Pretrial Services Office the people with whom she lived at the time of her arrest.  Her family ties are all in Indonesia; she has no family ties to this community or to

any community within the United States.

The four released Defendants have immediate family members residing lawfully in Albuquerque. They have substantial financial investments in this community through their business and home ownerships. They have not used numerous addresses and false social security numbers to impede investigation.

According to the United States' allegations, most, if not all of the others, have more involvement in the alleged activities and more resources than Ali. For example, Defendant Jing Song Jiang has resident alien status. As disclosed in the search warrant affidavit's allegations, the United States contends that he is the investigation's "principal subject," Affidavit of Kelly Wigley at 7:5-8:8 (executed April 5, 2004), is a part owner of four restaurants in two different cities, see id. at 21:13-16, and is "known for carrying large sums of currency," id. at 63:1-4. The United States makes no such allegations against Ali, and the United States' affidavit mentions Jing Song Jiang's name 34 times before Ali's name is mentioned. The affidavit references Jing Song Jiang 63 times and mentions Ali 14 times.

## PROCEDURAL BACKGROUND

On the morning of August 3, 2004, The Honorable Robert Hayes Scott, United States Magistrate Judge, held a hearing on the United States' Motion for Detention Hearing, filed July 29, 2004 (Doc. 9). At that detention hearing, Ali submitted her Declaration, which explained the persecution that she endured as a Chinese Christian in Indonesia and assured the Court that she would appear as required, stating:

> My dream is to be permitted to keep [the gift of living in freedom, peace, and security] for the rest of my life, and the only way that can happen is if I clear myself of these criminal charges and am permitted by the United States to stay in this

country. If I were not to show up for Court, I would be throwing away my only chance for a good life.

Declaration of Linda Ali ¶ 4, at 1 (executed August 2, 2004)(Doc. 27). Judge Scott ordered that Ali be detained pending trial.

Later that day, Ali filed an Emergency Motion For Immediate Release From Illegal Detention, In Violation Of 18 U.S.C. § 3142, filed August 3, 2004 (Doc. 22) and an Appeal From Magistrate's Detention, filed August 3, 2004 (Doc. 23). The Court held a detention hearing on August 3, 2004 in accordance with 18 U.S.C. § 3142(f). See Transcript of Hearing at 3:1-5. The Court held the emergency hearing with little notice and while the case agent, Special Agent Kelley Wigley, was out of town.

At the emergency hearing, Ali attacked the case's strength during her counsel's opening statement and made clear what Ali's intentions were for the hearing:

> I'd like to have an opportunity to cross-examine the agent about why he thinks that she should not be released and what the – and the strength of the Government's case, because that's one of the factors under the statute, and we believe that the Government has a very weak case against my client.

Transcript at 5:1-6. The United States first stated that it was ready to proceed to a hearing addressing, among other things, the strength of the government's case. See id. at 5:1-6; id. 9:5-6. The Court then asked the United States if it was "ready to go for a hearing," and the United States said: "Yes." Id. at 9:5-6. Thereafter, the United States told the Court that, "for efficiency sake, I'd be happy to present my case via proffer, and if Mr. Fallick wishes to cross [Immigration Naturalization Services Special] Agent [Bob] Godshall, he can do so, just to get the matter going." Id. at 10:9-12. The United States then responded to Ali's Declaration by proffer.

To carry its burden, the United States painted an extensive picture of Ali's alleged activities.

For example, the United States proffered that it "knew" that Ali "was using" a false "Social Security card." Id. at 15:16-17. To show that Ali had undisclosed financial assets that increased the alleged risk of flight, the United States made the following factual proffer: "[W]e know one thing, that based on Grand Jury subpoenas, that Ms. Ali does wire at least $2,000 a month, yet claims to only be making $2,400 a month." Id. at 16:23-17:1. See id. at 57:14-19.

The United States then discussed why it had a strong case against Ali. The United States proffered that the restaurant hired and provided housing for known illegals and transported them back and forth between the housing and the restaurant. The United States stated:

> [I]t is Ms. Ali that assisted in the obtainment of the apartments that were harboring the illegals in this case -- that is, apartments at the Eagle Ranch apartments -- that she served as an interpreter, and we actually have the checks that she signed that were drawn on the Grand China restaurant paying the rent at Eagle Ranch apartment for apartment 1322, which is where the illegals were being harbored.

Id. at 19:5-16. See id. 20:1-13.

The United States repeatedly stated that Ali would have an opportunity to cross-examine Godshall about that proffer. See id. at 17:21-22, id. at 19:3-15, id. at 21:2-3 (reiterating that the United States sought to carry its burden by proffer and that Godshall was available for cross-examination). Godshall was present for the purpose of demonstrating Ali's immigration status to the Court, but Ali did not cross-examine him on that point. Ali sought to cross-examine Godshall on the factual scenario the United States proffered, but the United States objected and asked the Court to disregard the cross-examination, arguing:

> [T]he record is being made here that's worthless. Godshall did not work the main body of this case. And if I had known we were going to get into all this, then I would have asked that we have a second hearing. . . . And that is my objection, is that he's asking these questions of the wrong witness, but with, you know, an hour's notice, I brought the INS agent because I thought that the issue here was her legal status.

Id. at 33:5-9, id. at 33:15-18.  See id. at 49:14-17 ("Agent Godshall isn't the proper agent to be asking those questions of.  He was here to address this issue of her status as an illegal here in the United States, which wasn't even cross-examined on.").

The United States repeatedly objected to the Court's consideration of cross-examination.  Ali contends that the United States effectively prevented her from making an adequate record.

In closing argument, the United States responded to Ali by arguing that the reality of Ali's immigration circumstances meant that her dream – and thus her motivation to appear – "ha[d] dissipated" and "there [was] nothing to suggest she would not flee."  Transcript at 53:20-22.  More specifically, the United States asserted as follows:

> In other words, it's not as if she's been granted permanent residency and she wants to stay and fight to retain that legal status.  She doesn't have legal status.  Nothing to salvage.  And so there is an incentive for her [sic] flee rather than face criminal prosecution and then, with a potential felony conviction, ultimate deportation anyhow.

Id. at 15:24 -16:4.

> Your Honor, the declaration provided to the Court just now, and to me, authored by Linda Ali is entirely premised on the assumption that she is going to have an asylum hearing, and I have just indicated that, according to the district counsel's office, that isn't going to take place.  That is going to be at best postponed until the end of the prosecution, and if she is convicted of a felony offense, she will be deported because it is an aggravated felony.

Id. at 47:16-23.  "And she has no hope right now."  Id. at 51:17.  "And it is an aggravated felony. She will be deported.  Why stick around to be convicted and then be deported?  Why not leave instead of doing any time in the federal penitentiary, prior to deportation?  It's just an argument of logic."  Id. at 53:25-54:1.

The Court concluded at the August 3, 2004 hearing that "for the present time the Court has

to see the record as showing that [Ali] is without legal status here in the United States." Id. at 60:2-4. The Court relied on the United States' proffer that Ali used a false Social Security number. See id. at 60:20-21. The Court also specifically relied on the alleged wiring of money in concluding that Ali was a flight risk. See id. at 61:16-19. The Court relied on the United States' presentation as a whole to conclude that -- based on the United States' urging -- the United States' evidence against Ali was strong. The Court made "a finding that, based upon the record before it today, the defendant should remain in custody pending resolution of this matter, because it does not see from the record before it that there is any condition or combination of conditions that will reasonably assure that Ms. Ali will appear in court when she is summoned." Id. at 63:15-20. On August 3, 2004, the Court affirmed Judge Scott's detention order because there were no conditions that would reasonably assure Ali's appearance.

The United States Magistrate Judges granted pretrial release to four Defendants in this matter and in the two other matters that the United States has identified as related cases. Those Defendants were released on conditions less stringent than the conditions Ali has proposed here. The United States agreed to a combination of conditions of release for the four Defendants that included "an ankle bracelet, surrender of the passport," and a letter to the Defendants' "embassy and any consulates" saying they had surrendered their passport and "reissuance should not occur until after the prosecution of this case." Transcript at 57:2-9.[2] Those four Defendants are all lawfully present in the United States. They include persons whom the United States has contended have more involvement in the alleged activities and more resources than Ali, which would presumably give them more incentive and capacity to flee, if they chose to do so. They fully answered questions that

---

[2] The United States has already seized Ali's passport.

Pretrial Services put to them.  Those Defendants were released on these conditions, and none have fled. A fifth Defendant is detained because he, like Ali, is unlawfully in this country.

Ali moves to reopen her detention hearing and to set release conditions, alleging new information is available that is material to whether there is any available combination of conditions that "will reasonably assure the appearance of [Ali] as required." 18 U.S.C. § 3142(f).  In addition to the conditions of release that were available at the time of the initial detention before the Court, Levy has agreed to post valuable real estate property in North Albuquerque Acres, with a value of approximately $170,000.00, as security for Ali's release.  Levy has met with Pretrial Services to provide the necessary particulars regarding this security, and Pretrial Services is satisfied with the information he provided.  Levy feels he knows Ali well enough to be comfortable posting this valuable real estate and to be confident that she would not betray his trust.  Ali's proposed conditions of release, therefore, include Levy posting his real estate, opening up his home to Ali, and serving as her third-party custodian, in addition to the conditions of release Ali previously proposed.

## LAW ON REOPENING DETENTION HEARINGS

Title 18, U.S.C. § 3142(f), provides that a detention "hearing may be reopened . . . at any time if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). See United States v. Cisneros, 328 F.3d 610, 614 (10th Cir. 2003)("Revocation of a prior release order under § 3142(f) is available only when the review of a detention or release order is being conducted by the same judicial officer who entered the order and when new, material information is available.").

**LAW ON DETENTION**

Under 18 U.S.C. § 3142(g), "in determining whether there are conditions of release that will reasonably assure a defendant's appearance of the person as required," a court considers the nature of the offense charged, the weight of the evidence against the defendant, the defendant's history and characteristics, such as ties to the community, family ties, employment, financial resources, and the defendant's character. See 18 U.S.C. § 3142(g).

**ANALYSIS**

There is some new information available to the Court material to "whether there are conditions of release that will reasonably assure the appearance of" Ali as these proceedings will require. 18 U.S.C. § 3142(f). But the only significantly new factor to arise since the Court's order is Levy's offer of an appearance bond on Ali's behalf. The Court does not think that new factor is enough for the Court to reverse Judge Scott's decision and this Court's prior affirmance of his decision.

**I.     THE COURT HAS AGREED TO CONDUCT A SECOND HEARING.**

Ali contends that, to appreciate fully the need to reopen the detention, it is necessary to recall the United States' presentation at the initial hearing and to show the United States' approach to the August 3, 2004 hearing prevented Ali from making an adequate record. Ali contends that - - given that the United States proffered alleged facts with the promise that the proffer would be subject to cross-examination, but then the United States objected to that cross-examination of its only available witness -- she had no real opportunity "to cross-examine witnesses who appear at the hearing," as 18 U.S.C. § 3142(f) requires. To give Ali a full opportunity to develop her record, the Court agreed to a second hearing.

## II. THE ALLEGED MISREPRESENTATIONS THAT THE UNITED STATES MADE AT THE FIRST HEARING DO NOT CHANGE THE COURT'S CONCLUSION THAT ALI SHOULD NOT BE RELEASED BEFORE TRIAL.

Ali contends that the United States made misrepresentations regarding the number of illegal aliens housed at the Eagle Ranch apartments. In the Court's opinion, the United States made no misrepresentations via proffer or Godshall's testimony regarding the number of illegal aliens housed at the Eagle Ranch apartments. See Transcript at 20:7-9. That some of the workers living at the Eagle Ranch were not illegals may undercut somewhat the United States' contention that the case against Ali is strong, because she allegedly was actively involved in harboring legal workers. In any event, Ali's complaint about the United States' presentation at the first hearing is not determinative of the release issues, because the indictment lists the number and identity of each alien that Ali is charged with harboring. Most of the argument about whether the United States made misrepresentation or errors in the emergency hearing are not relevant to the Court's task, which is to determine whether Ali presents a serious flight risk.

## III. NO CONDITIONS OF RELEASE WILL REASONABLY ASSURE ALI'S APPEARANCE.

Ali contends that the newly available security -- without more -- is a material change in circumstances sufficient to demonstrate that there now is a sufficient combination of conditions of release to reasonably assure Ali's appearance as the criminal proceedings will require. Ali contends that the newly available security, along with the other conditions previously proposed, together constitute stringent and effective conditions of release. Ali maintains that she is committed to clearing herself of the criminal charges, pursuing her asylum application, and honoring the trust of her surrogate grandfather, Levy. She also contends that, given these conditions, she would not be in a

position to flee. Accordingly, she argues that the currently proposed combination of conditions of release provides the "belt and suspenders" to Ali of both (i) the incentive to stay and defend; and (ii) the practical inability to do otherwise.

There is no presumption that Ali is detainable. Accordingly, the issue is whether under §312(g) there are conditions of release that will reasonably assure Ali's appearance as the proceeding requires.

The nature of the charges in this case are particularly relevant, because they are aggravated felonies that will likely result in deportation if Ali is convicted. See 8 U.S.C. § 1101(a)(43)(D), (N). The United States represents that there are material witnesses who will testify to Ali's harboring of illegal aliens and that there are eye witnesses and documentary evidence to prove her money laundering activities. Consequently, the weight of the evidence weight against Ali is strong. Also, Ali has no ties to this community or to any community within the United States. Ali's many addresses evidence her transient nature.

Ali's character is another factor that concerns the Court. In her asylum application, Ali swore under penalty of perjury what appears to be false statements. Before the criminal investigation, Ali did not report her income to the IRS. She has answered questions that government officials have asked her untruthfully and evasively. She has employed tactics that have thwarted a "paper trail." Although it is unclear at this stage whether she did so intentionally, what remains unknown about Ali's life, coupled with her transient nature, continues to suggest to the Court that she is a flight risk. The bond offered by Mr. Levy does not adequately assure Ali's appearance.

## IV.     THE RECORD SUGGESTS THAT, IF ALI IS CONVICTED, SHE WILL BE DEPORTED.

Ali contends that the United States' proffer at the initial detention hearing regarding Ali's immigration status was legally incorrect and overstated the logic of the United States' detention argument. Ali asserts that Lawit's Declaration clarifies a number of incorrect statements of law that the United States made at the initial detention hearing. See Defendant Linda Ali's Motion to Reopen Detention Hearing and Set Conditions of Release, Pursuant to 18 U.S.C. §3142(f) ¶ 5, at 3. Lawit contends that these inaccurate statements led the United States to "substantially overstate the likelihood that Ms. Ali will be removed" from this country. Declaration of John W. Lawit ¶ 3, at 2 (executed September 8, 2004).

Specifically, Ali argues that the United States' contention that Ali had "no hope" and therefore "nothing to suggest she would not flee" was based on an incorrect statement of the law. Ali contends that an accurate application of immigration law -- as set forth in Lawit's Declaration -- demonstrates that Ali's dream of staying in this country remains viable, and her incentive to clear herself of criminal charges remains intact. Ali contends that the United States' incorrect statements of law went to the heart of its contention that Ali is a flight risk for whom there is no combination of conditions that would assure her appearance as these proceedings require.

While Ali criticizes the United States for being too pessimistic about Ali's chances for being granted asylum, the Court fears that Lawit's declaration is overly optimistic. Importantly, Ali's position relies on speculation about what may be possible in the future. But the question whether Ali is a serious flight risk should rest on the facts as they currently exist. What is fact at this time is that Ali is not lawfully in this country.

If the Court were to approve Ali's release to Levy as a third-party custodian, and on the condition that the real estate be posted, Levy would presumably be highly motivated to be a diligent custodian who would ensure that Ali complied with all of the conditions of her release. But the Court is not convinced that arrangement provides any greater incentive for Ali to show up for court. Ali's new information, together with the information presented at the August 3, 2004, detention hearing and otherwise previously available to the Court, does not demonstrate that the release conditions that Ali recommends are sufficient to assure that Ali will appear when the Court summons her and to otherwise secure her attendance as these proceedings will require.

## IV.    **DETENTION OF ALI IS NOT UNFAIR.**

Ali mentions the conditions of release to which the United States agreed for four other Defendants in these related cases. Ali argues that, given the pretrial release of other Defendants on less stringent conditions, who allegedly had a greater role in the alleged conspiracy, fairness dictates Ali be released as well. Ali asserts that, on its face, the difference in treatment between Ali and Jing Song Jiang is unfair. Ali argues that, taken in connection with a correct statement of the applicable immigration law, the corrected factual record, the success of the other Defendants on pretrial release, and Ali's relatively minor role in the alleged conspiracy, fairness dictates that the Court grant Ali pretrial release as well.

The disparate treatment is justified, based at least in part on differences in immigration status. In contrast to the four released Defendants, Ali is unlawfully in the country, transient in her lifestyle, untruthful and evasive in her dealings with government officials, and lacking any familial or financial ties to the community. The differences between Ali and Jing Song Jiang are significant enough that the detention of Ali and release of Jing Song Jiang is not inherently unfair.

**IT IS ORDERED** that the Defendant's motion is granted in part and denied in part. The Court will reopen her detention hearing, but will not set release conditions. The detention order is affirmed.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
  United States Attorney
    for the District of New Mexico
Tara C. Neda
  Assistant United States Attorney
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Gregg Vance Fallick
Albuquerque, New Mexico

    *Attorney for Defendant Linda Ali*